**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellant,*

v.

DAMON KIMBROUGH,
            *Defendant-Appellee.*

No. 06-4341

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Andre M. Davis, District Judge.
(1:05-cr-00363-AMD)

Argued: October 27, 2006

Decided: February 16, 2007

Before WILKINSON, GREGORY, and DUNCAN, Circuit Judges.

Reversed and remanded by published opinion. Judge Duncan wrote
the opinion, in which Judge Wilkinson and Judge Gregory joined.

## COUNSEL

**ARGUED:** Richard Charles Kay, Assistant United States Attorney,
OFFICE OF THE UNITED STATES ATTORNEY, Baltimore,
Maryland, for Appellant. Joanna Beth Silver, Assistant Federal Public
Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Bal-
timore, Maryland, for Appellee. **ON BRIEF:** Rod J. Rosenstein,
United States Attorney, Baltimore, Maryland, for Appellant. James
Wyda, Federal Public Defender, Baltimore, Maryland, for Appellee.

**OPINION**

DUNCAN, Circuit Judge:

This appeal examines the extent to which the government may rely at trial on statements elicited by a third person—here, a suspect's mother—prior to police giving the suspect a valid warning under *Miranda v. Arizona*, 384 U.S. 436 (1966).

The United States appeals the district court's order suppressing statements made by Damon Kimbrough ("Appellee") in response to questions asked by his mother. Appellee had been arrested, but he had not yet been adequately advised of his *Miranda* rights. Appellee's responses to his mother's questions in the presence of police led to the discovery of a firearm.[1] Because Appellee's mother spontaneously asked the questions at issue without direction by, or even a tacit understanding with, the police officers, and because the officers' actions did not constitute interrogation under *Miranda* and its progeny, we find the Fifth Amendment not offended. We therefore reverse.

I.

On May 28, 2005, Baltimore City Police Officers Robert Himes and Earl Thompson received an anonymous tip that two men were selling drugs on the front steps of 1939 Hollins Street.[2] The officers

---

[1]The discovered firearm and other physical evidence was not suppressed, both because the district court found no Fourth Amendment violation and because physical evidence discovered as a result of a *Miranda* violation is admissible. *See United States v. Patane*, 542 U.S. 630, 636-37 (2004); *cf. Oregon v. Elstad*, 470 U.S. 298, 308-09 (1985) (holding uncoerced statements elicited after *Miranda* warnings admissible even where confession is first given prior to such warnings); *Michigan v. Tucker*, 417 U.S. 433, 446 (1974) (declining to suppress testimony of third-party witness whose identity was discovered through a suspect's statement given without the benefit of *Miranda* warnings).

[2]On that date, 1939 Hollins Street was the home of Appellee; his mother, Yolanda Kimbrough; his uncle, Tony Kimbrough; his sister Nikita Kimbrough; and Nikita Kimbrough's young son.

parked nearby and saw two men who matched the description provided by the anonymous informant sitting on the front steps. The policemen also saw the men conduct an apparent drug transaction with the occupants of a vehicle.

The officers approached the two men and asked if they resided there. The men replied that they were visiting a friend. Officer Himes knocked on the door of the house, and Tony Kimbrough, Appellee's uncle, answered. He stated that the house belonged to Yolanda Kimbrough ("Ms. Kimbrough").

Ms. Kimbrough insisted there were no drugs in her home. She allowed the officers to enter and at some point signed a written consent form memorializing her authorization.[3] Upon entering the house, Officer Thompson heard a disturbance in the basement and both officers proceeded downstairs. The officers found Appellee sitting on a bed, apparently dividing cocaine on a plate with a razor blade; they then arrested and handcuffed him. Appellee was cooperative throughout.

While Officer Thompson took Appellee upstairs, Officer Himes called Ms. Kimbrough down to the basement and showed her what he had found. Ms. Kimbrough appeared genuinely "shocked and surprised" and asked to speak to her son. J.A. 31. When Appellee was brought back downstairs, his mother began asking him such questions as "[W]hat is this[?]" and "[I]s there anything down here?" J.A. 32-33. Officer Himes then attempted to recite *Miranda* warnings from memory to Appellee, who agreed to speak without a lawyer present.

Appellee responded to questions posed by his mother while looking at Officer Himes. When Ms. Kimbrough asked if there was anything else down in the basement, Appellee replied that there was a gun under the cushion of the couch. Officer Himes recovered the gun,

---

[3]The district court specifically found that Ms. Kimbrough, Appellee's mother and the lessee of the home, consented to the officers' entry into the house and to their subsequent search. Appellee disputes this finding but did not cross-appeal; therefore, the issue of her consent is not before us.

and then asked some follow-up questions that led to the discovery of more cocaine and cocaine-packaging material.

Appellee was arrested and charged with (1) possession of a stolen firearm in violation of 18 U.S.C. § 922(g); (2) possession of a stolen firearm in violation of 21 U.S.C. § 922(j); (3) possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841; and (4) possession of a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c).

Prior to trial, Appellee moved to suppress the statements made subsequent to his arrest. At the hearing on the motion, the district court found that the attempted *Miranda* warnings were ineffective, *see* J.A. 204-05, and the government does not now contest this finding. On appeal, the government further concedes that the follow-up questions posed by Officer Himes after Appellee revealed the location of the gun constituted custodial interrogation. The government therefore does not challenge the suppression of Appellee's responses to such questions.

The government nonetheless argued at the hearing before the district court that *Miranda* warnings were not required because Ms. Kimbrough, and not the police officers, asked the questions. The district court, however, rejected this characterization:

> The court finds and concludes that Miss Kimbrough's involvement in questioning her son was the equivalent of official custodial interrogation. It was obvious to Detective Himes that Miss Kimbrough being upset was really coming after her son, was angry at him, and that he would simply, as he put it, quite candidly in his testimony, she did his questioning for him, that is, Miss Kimbrough did the questioning that [O]fficer Himes otherwise would have done. So this was official interrogation.

J.A. 205. Because of its conclusion that Ms. Kimbrough's involvement in questioning[4] "was the equivalent of official custodial interro-

---

[4]Appellee argues in his brief that the district court never concluded that Ms. Kimbrough, and not Officer Himes, asked the question that led to

gation," J.A. 205, the district court granted Appellee's motion to suppress the statements he made in response to Ms. Kimbrough.[5] For the reasons explained below, we reverse.

## II.

In considering an appeal of a suppression order, "[w]e review the district court's factual findings for clear error and its legal determinations de novo." *United States v. Jarrett*, 338 F.3d 339, 343-44 (4th Cir. 2003). We view the facts in the light most favorable to the prevailing party below. *See United States v. Ellyson*, 326 F.3d 522, 527 (4th Cir. 2003).

---

the discovery of the gun. Appellee's Br. at 7-9. Indeed, the district court indicates some confusion on this point: "I don't recall from the testimony specifically is [sic] whether it was Officer Himes's question specifically that led to the discovery of the gun, but I think it was Miss Kimbrough's question or Officer Himes's question, that led to the additional drugs and the vials and what have you . . . ." J.A. 205-06.

The government responds that because the district court credited the government witnesses, J.A. 195, 201-02, and indicated it found the defense witnesses "incredible on the material points," J.A. 206, the only conclusion supported by the record is that Ms. Kimbrough asked the question that led to the discovery of the gun, because that was the testimony of all of the credible witnesses on that point. Reply Br. at 2-4; *see also* J.A. 189 (discussion by the district court of the so-called "triangulation" by which Ms. Kimbrough asked the question, Appellee pointed to the sofa where the gun was concealed, and Officer Himes recovered the gun).

Appellee's counsel, however, did not press this issue at oral argument. Even viewing the facts in the light most favorable to Appellee, we assume, given the district court's language—"I don't recall from the testimony . . ." rather than "It was unclear from the testimony . . ."—that Ms. Kimbrough asked the question that led to the discovery of the gun, and Officer Himes asked the questions subsequent to that.

[5]Because the physical evidence is admissible in any event, the statements' admission may be of limited practical import. To be sure, the statements link Appellee to the firearm, but even without them a factfinder could infer Appellee's possession of the gun from its presence in the basement in which he lived. Our task, however, is to pass not on the evidentiary value of the statements but rather on their admissibility.

In *Miranda*, the Supreme Court held that because of the coercion inherent in a custodial setting, before beginning interrogation police must advise suspects of their Fifth Amendment right to remain silent. 384 U.S. at 444. The Supreme Court made clear in *Miranda* that "[b]y custodial interrogation, [it] mean[t] questioning initiated *by law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* (emphasis added). If the suspect is not subjected to "official" interrogation, however, the Fifth Amendment is not implicated. *See Illinois v. Perkins*, 496 U.S. 292, 297 (1990) ("It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation.").

Moreover, beyond actual questioning by the police, the Supreme Court has recognized that certain conduct also implicates *Miranda*. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (emphasis added). Thus, the Supreme Court has broadened the concept of interrogation to include either "express questioning or its functional equivalent." *Id.* at 300-01. In *Innis*, the defendant was charged with the robbery, kidnapping, and murder of a taxicab driver. *Id.* at 295. The murder weapon was believed to be a sawed-off shotgun. After being advised of his *Miranda* rights and requesting to speak with an attorney, the defendant was placed in a police vehicle with two officers to be driven to the police station. En route, the police officers discussed with each other, but within earshot of the defendant, the missing shotgun, which was believed to be located in an area near a school. One officer lamented the possibility that a child might happen upon the missing weapon and suffer harm as a result, and the other agreed. The defendant then interjected, asking the officers to turn the car around so that he could show them where the gun was located. *Id.* at 293-95.

In its analysis in *Innis*, the Court reviewed the coercive police practices that had triggered the *Miranda* Court's concerns about the "interrogation environment," such as "the use of line-ups in which a coached witness would pick the defendant as the perpetrator" and "the so-called 'reverse line-up' in which a defendant would be identified by coached witnesses as the perpetrator of a fictitious crime." *Id.* at 299 (quoting *Miranda*, 384 U.S. at 453, 457). The Court held that these "psychological ploys" were likely to "undermine the privilege against compulsory self-incrimination" even in the absence of express

questioning. *Id.* On that reasoning, it extended *Miranda*'s safeguards to behavior constituting the "functional equivalent" of express questioning, while retaining the prerequisite focus on police action as, indeed, the Fifth Amendment requires. *See id.* at 300-01.

The Court in *Innis* defined the functional equivalent of questioning as "any words or actions *on the part of the police* (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301 (emphasis added). It noted that "[t]he latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.* Such focus is appropriate, as the *Miranda* safeguards were intended to protect suspects from being coerced into waiving their Fifth Amendment rights. *See id.*

The Supreme Court then applied the functional equivalence test to the facts before it. Although conceding that the officers' conversation provided "subtle compulsion," the Court concluded that the officers' brief remarks to one another did not rise to the level of interrogation. *Id.* at 294-95, 303-04. First, there was no express questioning of the defendant. *Id.* at 302 ("[The] conversation was, at least in form, nothing more than a dialogue between the two officers to which no response from the respondent was invited."). Furthermore, that the officers' conversation offered "subtle compulsion" to the defendant was not the end of the Court's inquiry. The Court went on to examine whether police should have known that their brief conversation was reasonably likely to elicit an incriminating response from the suspect. *Id.* at 303-04. The Court found nothing in the record to warrant a conclusion that in making a "few off hand remarks" to one another, the police knew or should have known the suspect would be particularly susceptible to an emotional appeal to the safety of children or that the suspect was "unusually disoriented or upset." *Id.* at 303. The Court did suggest that if the officers' conversation within earshot of the suspect had been "a lengthy harangue" or if their comments had been particularly lurid, its decision may have been more difficult. *Id.*

The Supreme Court next considered functional equivalence in *Arizona v. Mauro*, a case with facts similar to those before us in that the challenged statements came in response to questions from a third-party inquisitor. *See* 481 U.S. 520 (1987). In *Mauro*, the defendant

was arrested after claiming to have killed his son and leading police to the body. The defendant had been advised of his *Miranda* rights and informed police he did not wish to make any more statements without a lawyer present. At the station house, the defendant's wife asked to speak to her husband. The officers brought the couple together, and an officer remained in the room and recorded their conversation with a tape recorder placed in plain sight. The state sought to admit the tape-recorded conversation as evidence to rebut the defendant's insanity defense. The Supreme Court of Arizona relied on *Innis* in "conclud[ing] that the officers' testimony demonstrated that there had been interrogation, because [the officers] knew that if the conversation [between the Mauros] took place, incriminating statements were likely to be made." *Id.* at 525 (internal quotation omitted). The Supreme Court reversed. In so doing, the Court did not examine the actions of Mrs. Mauro, which are beyond constitutional reach and concern, but rather the actions of the police officers who allowed husband and wife to meet and speak to one another and who remained present for the conversation and tape recorded it. *See id.* at 527 ("The sole issue, then, is whether *the officers'* subsequent actions rose to the level of interrogation . . . .") (emphasis added).[6]

The Court found none of the police conduct in *Mauro* improper. *Id.* at 529 ("Mauro was not subjected to compelling influences, psychological ploys, or direct questioning."). Without prompting, Mrs. Mauro requested to speak with her husband, and the police had legitimate reasons to station an officer in the room while the couple spoke. *See id.* at 523-24, 528 (ensuring Mrs. Mauro's safety and preventing collusion between the couple, not "securing incriminating statements," were the reasons the officer listened to the conversation).

---

[6]In the instant case, the district court improperly focused on Ms. Kimbrough's role as the questioner rather than on the police officers' conduct. The district court's conclusion that "Miss Kimbrough's involvement in questioning her son was the equivalent of official custodial interrogation," *see* J.A. 205, is at best incomplete and, taken literally, is simply erroneous. Because Ms. Kimbrough is a private citizen, her spontaneous questioning of Appellee alone, independent of the actions of the police officers, could never implicate the Fifth Amendment. The Fifth Amendment is, as we have discussed, unconcerned with private, as opposed to state, interrogation. *See Perkins*, 496 U.S. at 297; *Elstad*, 470 U.S. at 304.

Additionally, the Court made clear the limits of its decisions in *Miranda* and *Innis*: "Officers do not interrogate a suspect simply by hoping that he will incriminate himself." *Id.* at 529. Viewing the situation from the suspect's perspective in *Mauro*, the Court "doubt[ed] that a suspect, told by officers that his wife will be allowed to speak to him, would feel that he was being coerced to incriminate himself in any way." *Id.* at 528.

Rather, as *Miranda* and its progeny make plain, confessions given freely and without compelling state influences are admissible and indeed, desirable. *See, e.g.*, *Elstad*, 470 U.S. at 305. "Volunteered statements of any kind are not barred by the Fifth Amendment . . . ." *Mauro*, 481 U.S. at 529 (quoting *Miranda*, 384 U.S. at 478); *see also Innis*, 446 U.S. at 299-300. That a statement is "volunteered" in response to questions or compelling influences emanating from private or other nongovernmental sources does not change this analysis. Again, the issue in *Miranda* and its descendants is whether particular actions *by the police*, either express questioning or its functional equivalent, constitute interrogation. This singular focus on *police* conduct is constitutionally mandated by the Fifth Amendment's applicability solely to state action. As the Supreme Court pointed out in *Oregon v. Elstad*, the Fifth Amendment is not "concerned with moral and psychological pressures to confess emanating from sources other than official coercion." 470 U.S. 298, 304-05 (1985). Therefore, with *Innis* and *Mauro* as guidance, we turn to a consideration of the police conduct before us.

### III.

In this case, Appellee argues that the police subjected him to tactics that constituted the functional equivalent of express questioning. He contends that the encounter with his mother "took place amidst compelling influences in a coercive, police-dominated environment." Appellee's Br. at 7. In Appellee's view, by bringing Ms. Kimbrough to the basement to see the drugs, the police orchestrated a series of events that culminated in Ms. Kimbrough asking to speak to her son, questioning him, and eliciting his inculpatory responses in the presence of police. We cannot agree.

We note at the outset that Appellee faces a difficult challenge in advancing this argument. He cites no cases, nor can we locate any, in

which statements or confessions elicited through private questioning have been suppressed. *See, e.g.*, *Mauro*, 481 U.S. at 525; *United States v. Alexander*, 447 F.3d 1290, 1295-96 (10th Cir. 2006) (statement to FBI admissible where prison officials placed suspect's friend in adjoining cell and friend encouraged confession, but officials "did not develop the planned encounter, nor suggest any techniques to help [the friend] convince [the suspect] to provide a statement to the FBI"); *Whitehead v. Cowan*, 263 F.3d 708, 719 (7th Cir. 2001) (statements admissible when suspect's roommate urged his confession because police neither directed the roommate's questioning nor engaged in a ploy to elicit the confession); *United States v. Gaddy*, 894 F.2d 1307, 1309-11 (11th Cir. 1990) (defendant's aunt, who was a police officer, acted as a private citizen in encouraging him to speak to investigating officers); *Snethen v. Nix*, 885 F.2d 456, 459-60 (8th Cir. 1989) ("coercion" by defendant's mother led him to make inculpatory remarks, which were not suppressed); *see also United States v. Romero*, 897 F.2d 47, 52-53 (2d Cir. 1990) (questioning by emergency room nurse); *United States v. Borchardt*, 809 F.2d 1115, 1119 (5th Cir. 1987) (same); *United States v. Pullen*, 721 F.2d 788, 790-91 (11th Cir. 1983) (questioning by bank employees).

Of course, we nonetheless recognize that the facts before us are unique, and consider them in light of the purpose underlying *Miranda*: "preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." *Mauro*, 481 U.S. at 529-30. First in *Innis* and later in *Mauro*, the Supreme Court viewed the officers' conduct as standing in sharp contrast to that challenged in *Miranda*, *see* 446 U.S. at 299; 481 U.S. at 526, and concluded that the line between reasonable police work and interrogation had not been crossed. We engage in the same analysis and reach a similar conclusion here. To quote the *Mauro* Court, "[t]he government actions in this case do not implicate [*Miranda*'s] purpose in any way." 481 U.S. at 530.

Despite the breadth of Appellee's assertion that his interrogation was "orchestrated, initiated, and controlled by police officers," Appellee's Br. at 14, the factual bases for his claims devolve to two specific police actions: that the officers showed Ms. Kimbrough the drugs in the basement, and that they allowed Ms. Kimbrough to communicate with her son in their presence. Neither individually nor taken together

can these actions be considered to subject Appellee to the functional equivalent of questioning.

We cannot say that the officers should have known that showing Ms. Kimbrough the drugs in her house would coerce an incriminating response from her son. Indeed, there is no evidence in the record that the officers had any reason to believe that Ms. Kimbrough would confront Appellee at all. There is simply no evidence in the record that they knew or suspected that Ms. Kimbrough would ask officers to bring her son to the basement and then bombard him with questions. Although perhaps a fortuitous consequence from the officers' perspective, it was no more so than the situation in *Innis*, and the actions of the officers here were arguably less calculated. *See Innis*, 446 U.S. at 302. The officers' mere awareness of the possibility that showing Ms. Kimbrough the drugs *might* prompt her to speak to Appellee, and, if so, that Appellee *might* incriminate himself, does not constitute interrogation. *See Mauro*, 481 U.S. at 528-29.

Moreover, there is no evidence in the record of a tacit agreement, discussion, or understanding between the police officers and Ms. Kimbrough that she would ask questions or attempt to elicit incriminating information. That the officers were caught off guard by her behavior is, in fact, underscored by Officer Himes' ineffectual attempt to interject *Miranda* warnings before Appellee could respond.[7]

Further, there is uncontroverted evidence, including her own testimony, that Ms. Kimbrough had personal motivations for interrogating Appellee. Beyond the natural anger of a mother who discovers that her son is involved with drugs, Ms. Kimbrough had rented her housing-authority-owned home for more than two decades, and she was aware that drug activity within could cause her to lose her family's long-time residence. J.A. 74, 85, 199.

---

[7]The government would have our decision turn on whether Ms. Kimbrough was acting as an agent for Officer Himes in questioning Appellee, arguing of course that Ms. Kimbrough was not such an agent. Given the complete absence of any communication or understanding between Ms. Kimbrough and the officers on these facts, however, we need not reach the question of whether agency principles might ever be applicable or appropriate in the Fifth Amendment context.

Like the police in *Mauro*, the officers here merely allowed the Appellee's mother, on her own initiative, to speak with her son and remained present while the two talked. The Supreme Court in *Mauro* made it clear that such practices, standing alone, do not constitute interrogation: "Police departments need not adopt inflexible rules barring suspects from speaking with their spouses, nor must they ignore legitimate security concerns by allowing spouses to meet in private." *Mauro*, 481 U.S. at 530. Here, too, the officers had similar legitimate reasons "not related to securing incriminating statements" for remaining in the room while mother and son spoke, *see id.* at 528; these include the presence of drug evidence and the reasonable belief that their absence could permit the destruction or concealment of that and other evidence. *See id.* at 523-24.

Viewing the encounter here from the perspective of the suspect, as *Innis* instructs us to do, further weakens Appellee's claim that official interrogation occurred. *See Innis*, 446 U.S. at 301; *Mauro*, 481 U.S. at 528. As the Supreme Court noted in *Mauro*, "[w]e doubt that a suspect, told by officers that his wife will be allowed to speak to him, would feel that he was being coerced to incriminate himself in any way." 481 U.S. at 528. We find it no less implausible that a suspect would feel coerced to incriminate himself by being faced with the prospect of speaking to his mother in her home.

The location of the discussion between mother and son here adds additional support for our conclusion that Appellee was not interrogated, standing as it does in sharp contrast to the police station and patrol car that formed the backdrop of the conversations in *Mauro* and *Innis*, respectively. Appellee answered questions posed by his mother in her home, which he shared and which was also occupied at the time by several other members of his family. The Supreme Court in *Miranda* recognized the inherently noncoercive nature of precisely such an environment, citing police manuals that advise officers to conduct interrogations in their offices rather than suspects' homes:

> If at all practicable, the interrogation should take place in the investigator's office or at least in a room of his own choice. . . . In his own home [the subject] may be confident, indignant, or recalcitrant. He is more keenly aware of his rights and more reluctant to tell of his indiscretions or crimi-

nal behavior within the walls of his home. Moreover, his family and other friends are nearby, their presence lending moral support.

*Miranda*, 384 U.S. at 449-50 (internal quotation omitted).[8]

In sum, Ms. Kimbrough, not the police, initiated the exchange with Appellee. Although the police allowed Ms. Kimbrough to speak with her son, they did so at her urging, in her home. There is no evidence in the record that the officers encouraged Ms. Kimbrough in connection with her questioning of Appellee. Therefore, Appellee's responses were volunteered for Fifth Amendment purposes because they were not the result of police interrogation—either by express questioning or its functional equivalent. They are therefore admissible, and the order suppressing them is reversed. We remand for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*

---

[8]Appellee urges us to rely on the fact that the police officers asked follow-up questions after Ms. Kimbrough's question, eliciting information that led to the discovery of additional drugs. However, as we have noted earlier, the government has conceded the inadmissibility of those responses.