PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.                                    No. 07-4508

COVONTI KWA MOSES,
          *Defendant-Appellant.*

Appeal from the United States District Court for the
Middle District of North Carolina, at Durham.
N. Carlton Tilley, Jr., District Judge.
(1:06-cr-00331-NCT)

Argued: May 16, 2008

Decided: September 2, 2008

Before NIEMEYER, KING, and GREGORY,
Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the
opinion, in which Judge King joined. Judge Gregory wrote an
opinion concurring in part and dissenting in part.

## COUNSEL

**ARGUED**: John A. Dusenbury, Jr., OFFICE OF THE FED-
ERAL PUBLIC DEFENDER, Greensboro, North Carolina,
for Appellant. David Paul Folmar, Jr., OFFICE OF THE
UNITED STATES ATTORNEY, Greensboro, North Caro-

lina, for Appellee. **ON BRIEF:** Louis C. Allen, Federal Public Defender, Greensboro, North Carolina, for Appellant. Anna Mills Wagoner, United States Attorney, Greensboro, North Carolina, for Appellee.

---

**OPINION**

NIEMEYER, Circuit Judge:

Following searches of two residences associated with Covonti Kwa Moses in Greensboro, North Carolina, police officers recovered illegal drugs and firearms. Moses pleaded guilty to possession with intent to distribute more than five grams of crack cocaine and to being a felon in possession of a firearm and was sentenced to 262 months' imprisonment. With the agreement of the court, Moses reserved the right to appeal the district court's denial of his motion to suppress, challenging the searches as unconstitutional.

Moses contends on appeal that the police officers' warrantless entry into the two residences was unsupported by probable cause and exigent circumstances, as claimed by the officers, and therefore violated his Fourth Amendment right to be free from unreasonable searches. Finding his arguments unpersuasive in the particular circumstances of this case, we affirm.

I

In May 2006, the Tactical Special Enforcement Team of the Greensboro, North Carolina police department commenced an investigation of a local street gang known as the "Goodfellas," which was suspected of involvement in drug trafficking, several shootings, and other related violent crimes. A month later, the officers apprehended the leader of the gang, Carl Kotay Graham, who provided the officers with

substantial information about the gang's activities and named Moses among its members.

Graham told officers that Moses, who was already well known to the officers from previous encounters, served as "an enforcer-type person for the group . . . who carried guns" and who "stash[ed] cocaine and firearms" at a residence on Cedar Street in Greensboro, "a cream-colored duplex." Graham also told the officers that Moses drove a "green Lincoln with temporary tags." Finally, he said that Moses had firearms and a ballistic vest in the house, as well as cocaine that he stashed for both Graham and another member of the Goodfellas gang.

When a Greensboro police officer thereafter observed a green Lincoln with temporary tags in front of 407 North Cedar Street, he alerted Officer Eric Goodykoontz, who visited the location and confirmed the fact. At Officer Goodykoontz's initiative, officers set up a "perimeter" in the area with the purpose of apprehending Moses.

While the perimeter was in place, Officer Goodykoontz observed Moses, whom he recognized from previous encounters, and a female emerge from unit A of 407 North Cedar Street. Moses was carrying what appeared to be shoe boxes, which he placed in the trunk of the Lincoln, and then the two returned to the house. Officer Goodykoontz could not, however, tell whether they entered unit A or unit B of 407 North Cedar Street. When Officer Goodykoontz ran a computer check on Moses, he discovered that Moses' driver's license was suspended. Shortly thereafter, Moses and his female companion returned to the Lincoln and drove away. Goodykoontz notified the other officers in the perimeter that Moses had left the premises and was driving on a suspended license.

Officers stopped Moses approximately one block from the Cedar Street residence. As Sergeant Tom Kroh approached the scene, he saw "Mr. Moses outside of the car, and he look-[ed] like he [was] dialing his phone. He [was] doing some-

thing with his phone . . . ." Sergeant Kroh asked Moses whom he was calling, and Moses replied that he was talking to his cousin, who lived in unit B of 407 North Cedar Street. When Moses explained that he had just left his cousin's house at 407-B North Cedar Street, Sergeant Kroh became concerned that Moses had alerted someone back at his Cedar Street residence about the traffic stop, and he ordered Moses to hang up the phone. The officers placed Moses under arrest for driving on a suspended license and found four grams of marijuana on his person. Sergeant Kroh advised Officer Goodykoontz, who had remained at the Cedar Street location, that he believed Moses may have alerted someone at the residence that the police had stopped him. Kroh then returned, with Moses in custody, to the Cedar Street residence.

Officer Goodykoontz knocked on the door of unit A, from which he had seen Moses emerge with the shoe boxes, but no one came to the door. The windows were blocked so that he could not see inside. At the same time, Sergeant Kroh and another officer knocked on the door of unit B, which was attached to unit A, and Catressa Moore came to the door. Moore admitted to the officers that Moses was her cousin, but she denied that he had just been visiting her, saying that he lived in unit A. Moore "further stated that she hated [Moses] and had nothing to do with him." Moore then began yelling and screaming at the officers, without provocation, creating such a loud commotion that Officer Goodykoontz heard it on the other side of the house while investigating unit A. Moore eventually gave consent to the officers to search her unit B to determine whether there was an interior access between the two units. The officers discovered none.

Officer Goodykoontz confronted Moses, who was inside a police vehicle in front of the Cedar Street residence, about his connection to unit A. Moses insisted that he had nothing to do with unit A and had been visiting his cousin in unit B. Because Goodykoontz had personally observed Moses come out of unit A, he and Sergeant Kroh decided to try Moses'

keys to determine whether a key provided access to unit A. When a key fit the lock on unit A, the officers "felt like [they] had enough for a search warrant on the residence." Sergeant Kroh and Officer Goodykoontz, however, were concerned that someone might be inside of unit A in the process of destroying evidence and also presenting a threat to the safety of the officers as they waited outside the house for a search warrant. Their concern arose from Moses' behavior in making the phone call during the traffic stop, his cousin's behavior in creating a loud commotion, the presence of a gold-colored vehicle parked in front of the house, the officers' inability to see inside unit A, and Moses' false denial of association with that unit. Sergeant Kroh, Officer Goodykoontz, and two other officers therefore decided to enter unit A to secure the premises and any evidence therein while they obtained a search warrant.

During a protective sweep, the officers found no one inside unit A, but they observed, in plain view, residue that they field tested and identified as crack cocaine, as well as a marijuana cigarette butt and some photos of Moses on the dresser in the bedroom. They exited approximately three minutes after entering, leaving officers on the front porch to keep the unit secure.

Based on the total information that the officers had, including the statements given them by Graham, the officers obtained a search warrant and conducted a search of unit A, where they recovered, among other things, a .44 magnum revolver.

While at the scene at 407 North Cedar Street, Officer Goodykoontz received a call from another officer who had been interrogating Graham. Graham had said that "Moses was selling crack cocaine out of a residence on Pearson Street." Connecting that information with an anonymous CrimeStoppers tip earlier in the week, which complained of a black male subject driving a green Lincoln and selling crack cocaine at 1309

South Pearson Street, as well as the officers' subsequent observation of a green Lincoln at the same address, Sergeant Kroh and several officers took Moses' keys to 1309 South Pearson Street and found that one of them opened the door. Again concerned that "if anybody was inside . . . they would be aware of [the officers'] presence," Sergeant Kroh authorized entry into the house. In a search that lasted less than a minute, the officers confirmed that no one was present in the home and observed in plain view digital scales and crack cocaine residue.

Based on the information obtained from 1309 South Pearson Street, as well as the information learned earlier, the officers also obtained a search warrant for 1309 South Pearson Street. Following a search of the residence, the officers recovered approximately 14 grams of crack cocaine.

Based on the crack cocaine found at the Pearson Street residence and the firearm found at the Cedar Street residence, Moses was indicted for possession with intent to distribute more than five grams of crack cocaine, in violation of 21 U.S.C. § 841(a) and § 841(b)(1)(B), and for possession of a firearm while being a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The indictment specified that Moses had previously been convicted of felony drug crimes in North Carolina courts in 2001 and 2002.

In a motion to suppress the evidence recovered during the searches of the two residences, Moses contended that the searches violated his constitutional rights because they were warrantless entries into houses where no exigent circumstances existed to justify an entry without a warrant. The district court denied Moses' motion. With respect to the Cedar Street residence, the court found that a reasonable officer could have believed that exigent circumstances existed, justifying the warrantless entry. But the court concluded that no such reasonable belief could be held with respect to the Pearson Street residence and therefore that the warrantless entry

of that house was unlawful. The court concluded nonetheless that the search warrant application for the Pearson Street residence contained sufficient independent evidence, untainted by the unlawful entry, to support the magistrate judge's finding of probable cause and the issuance of the warrant.

Moses then pleaded guilty, conditioned on his right to appeal the denial of his motion to suppress. *See* Fed. R. Crim. P. 11(a)(2).

On appeal, Moses contends: (1) that probable cause to enter 407-A North Cedar Street was lacking; (2) that no exigency existed to justify entry into 407-A North Cedar Street without a warrant; and (3) that the warrant application for 1309 South Pearson Street, when stripped of evidence tainted by the unlawful warrantless entry therein, did not contain enough information to support a finding of probable cause.

We address each argument in turn, construing the facts in the light most favorable to the government as the prevailing party below, *see United States v. Kimbrough*, 477 F.3d 144, 147 (4th Cir. 2007), and reviewing the district court's factual findings for clear error and its legal conclusions *de novo*, *see id.*

II

Moses contends that the Greensboro police officers lacked probable cause to believe that when they entered the residence at 407-A North Cedar Street, they would find contraband or evidence of a crime. He argues that "[t]he information that comprised the lion's share of the 'totality of the circumstances' concerning the existence of drugs inside Apartment 407A N. Cedar St. prior to the officers' warrantless entry consisted almost exclusively of information provided to police by Carl Kotay Graham on June 22, 2006." That information, in Moses' view, did not establish "a fair probability that contraband or evidence of a crime [would] be found" in the Cedar

Street residence. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Specifically, Moses points to an informal intelligence summary maintained by the Tactical Special Enforcement Team investigating the Goodfellas gang, which documented the interview with Graham but failed to indicate that Graham told the officers about drugs at the Cedar Street residence. The relevant entry in the summary reads as follows:

> [Graham] said that Covanti [Moses] is the man with the guns. He said that he lives on Cedar St. in a cream colored house which is 2 houses past Belle-meade (on the right) if driving north on Cedar. He drives a gray Intrepid and a green Lincoln. He has seen a .357 magnum, an SKS, and a ballistic vest there in the past two weeks. . . . He does not sell out of his house and lives there by himself. . . . Jerome Monk is supplying Moses with his cocaine.

Moses argues that because the summary says nothing to indicate that Moses stashed drugs at the Cedar Street residence, the district court erred in crediting Officer Goodykoontz and Sergeant Kroh, both of whom testified that Graham said Moses stored drugs at the Cedar Street residence.

Moses' argument challenges factual findings made by the district court, and we can disturb such findings only if they are clearly erroneous. While the district court acknowledged that it was "certainly a fair question as to why [Moses' stashing drugs] would not have been written down" in the intelligence summary, the court credited the officers' testimony and found as a fact that Graham "informed the police that Moses stashed money, drugs, and guns in a cream-colored duplex located on North Cedar Street." We owe particular deference to the district court's credibility findings, as the court is in a much better position to evaluate those matters. *See United States v. Abu Ali*, 528 F.3d 210, 232 (4th Cir. 2008); *see also Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985). Certainly, we cannot say that the district court's decision was

clearly erroneous when there was substantial evidence to support its conclusion.

Thus, the question is whether the evidence, which included the officers' testimony about what Graham said, supported a finding of probable cause.

The determination of whether probable cause exists depends on the totality of the circumstances and involves a "practical, common-sense decision whether . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. Because "probable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules," *id.* at 232, we "give due weight to inferences drawn from [the] facts by . . . local law enforcement officers," *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *see also United States v. Dickey-Bey*, 393 F.3d 449, 453 (4th Cir. 2004) ("Under this pragmatic, common sense approach, we defer to the expertise and experience of law enforcement officers at the scene").

The total circumstances informing the officers' decision in this case about whether contraband or evidence of a crime would be found in the 407-A Cedar Street residence included, in addition to Graham's statement that Moses kept guns and drugs at the residence, a wealth of background and contextual information corroborating Graham's statement. Graham described a cream-colored duplex on Cedar Street in which Moses lived and stashed drugs and guns, and Officer Goodykoontz observed Moses, whom he knew from earlier incidents, emerging from unit A — a cream-colored duplex on Cedar Street. Graham advised the officers that Moses drove a green Lincoln with temporary tags, and Officer Goodykoontz observed Moses enter a green Lincoln with temporary tags and drive away. When Moses was arrested, he had a quantity of illegal drugs on his person. Moreover, after he

was stopped and was found to have drugs on his person, he deflected the officers' attention from unit A, telling the officers that he had no connection to the unit. Yet Officer Goodykoontz knew that this statement was false as he had observed Moses exit from unit A. The officers also held suspicions relating to Moses' telephone call to his cousin after Moses was stopped and the commotion created by his cousin when spoken to by officers at unit B. Finally, keys taken from Moses fit the front door of unit A, despite Moses' protestation that he had nothing to do with the unit.

From all of this evidence, the officers concluded, in a common sense approach, that unit A probably contained contraband or evidence of a crime. And this is precisely the type of circumstance in which we defer to the officers' expertise and experience. *See Ornelas*, 517 U.S. at 699-700; *Dickey-Bey*, 393 F.3d at 453. Accordingly, we conclude that when the officers entered unit 407-A Cedar Street, they had probable cause to believe that contraband would be found inside.

III

Finding probable cause, however, fulfills only one half of the Fourth Amendment requirements in the circumstances of this case. "It is well established that, even when officers have probable cause to believe that contraband is present in a home, a warrantless search of the home is unlawful unless exigent circumstances exist at the time of entry." *United States v. Mowatt*, 513 F.3d 395, 399 (4th Cir. 2008) (citing *Payton v. New York*, 445 U.S. 573, 589 (1980)). Examples of exigent circumstances include a "risk of danger to the police or to other persons inside or outside the dwelling," *Minnesota v. Olson*, 495 U.S. 91, 100 (1990) (internal quotation marks omitted), and situations "where police officers (1) have probable cause to believe that evidence of illegal activity is present and (2) reasonably believe that evidence may be destroyed or removed before they could obtain a warrant," *United States v. Cephas*, 254 F.3d 488, 494-95 (4th Cir. 2001). The police are

not required to "produce concrete proof" that evidence was on the verge of being destroyed; "rather, the proper inquiry focuses on what an objective officer could reasonably believe." *United States v. Grissett*, 925 F.2d 776, 778 (4th Cir. 1991).

In *United States v. Turner*, 650 F.2d 526 (4th Cir. 1981), we articulated a nonexhaustive list of factors to consider in determining whether exigent circumstances are present:

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband.

*Id.* at 528.

In this case, the district court found that exigent circumstances existed to justify the warrantless entry into 407-A North Cedar Street, relying on the following:

> The proximity of the traffic stop to the North Cedar Street residence, Moses's cellular telephone call to his cousin in the adjacent apartment, and the extended commotion caused during the consensual search of apartment 407-B provided a reasonable basis for police officers to believe that anyone remaining in apartment 407-A was aware of the police action. Further, based on the information learned through Graham that Moses utilized the North Cedar Street residence as a stash house for money, drugs, and guns, it was reasonable for officers both to fear for their safety and to suspect the imminent destruction of evidence.

We review these findings for clear error. *See Mowatt*, 513 F.3d at 399; *Turner*, 650 F.2d at 528.

Moses argues that, given the evidence known to the officers before they created the perimeter in order to apprehend Moses, no objective officer could reasonably have believed that exigent circumstances existed. He points particularly to the fact that police had no evidence from Graham, their own observations of the Cedar Street location, or any other source that suggested another person besides Moses lived at the 407-A North Cedar Street residence or was present there on the day of the search. In fact, according to the informal intelligence summary maintained by the police, Graham specifically stated that Moses lived alone. Thus, Moses argues, in effect, that officers should not be permitted to adjust their beliefs to accommodate subsequently developed suspicions.

Moses, however, has no legal or logical basis to assert that officers must be governed by initial information and not be informed by later developments during the course of their investigations. Indeed, to deny officers the ability to react to information as it unfolds would directly contradict the instruction of *Ornelas* and *Dickey-Bey* to give deference to the experience and expertise of officers in drawing inferences from facts uncovered during investigations *in the field*.

It is true that the officers initially had no evidence suggesting that another person was present in 407-A North Cedar Street. When, however, Moses made a telephone call during the course of the traffic stop to his cousin at 407-B North Cedar Street — the residence adjacent to unit 407-A from which Moses was seen to have emerged — Sergeant Kroh became concerned that Moses had warned someone back at Cedar Street about the police so that evidence at 407-A could be removed or destroyed. Moreover, when the officers reacted to this suspicion and returned to 407-B North Cedar Street to interrogate the cousin, her behavior in causing a loud and unprovoked commotion added to the officers' suspicions that

someone else was present inside unit A and that her outburst was calculated as a warning to that person. *See United States v. Vasquez*, 638 F.2d 507, 531-32 (2d Cir. 1980) (upholding an exigent-circumstances search of a fourth-floor apartment where suspects deceived officers into investigating a second-floor apartment whose occupants created a loud commotion that officers reasonably believed might have warned persons on the fourth floor to the police's presence). The officers also observed that the windows of unit A were blocked and that a gold vehicle was parked outside the house, suggesting the possibility that someone else might be present. Moses' argument simply ignores these highly relevant facts.

The district court considered all of these facts and made a finding that exigent circumstances existed to justify the immediate entry into unit 407-A. We cannot conclude that the district court's factual findings were clearly erroneous in light of the circumstances.

IV

Finally, Moses contends that the search warrant issued for 1309 South Pearson Street was not supported by probable cause after evidence obtained during the illegal entry of that residence is eliminated from the application for the warrant. The district court found that the officers did not have exigent circumstances to enter the Pearson Street residence, and the government has not appealed that decision. Accordingly, evidence obtained during entry of the residence may not be considered to support the search warrant subsequently obtained, and we must determine whether, when that evidence is excluded from the application for the warrant, probable cause to support the warrant still existed. *See United States v. Karo*, 468 U.S. 705, 719 (1984) ("[I]f sufficient untainted evidence was presented in the warrant affidavit to establish probable cause, the warrant was nevertheless valid"); *United States v. Gillenwaters*, 890 F.2d 679, 681 (4th Cir. 1989) (same).

In view of our holding that the officers had probable cause to justify a warrant for 407-A North Cedar Street, it follows that they also had probable cause to obtain a warrant to search 1309 South Pearson Street, as the evidence in support of probable cause for both locations was substantially the same. The officers had information that Moses lived and/or sold drugs at the houses; that Moses drove a green Lincoln with temporary tags to both locations; that Moses possessed drugs; that Moses possessed keys that gave him access to both residences, and they had the evidence discovered from the exigent entry into 407-A North Cedar Street. In addition to that common evidence, the officers also had evidence particular to the Pearson Street residence, namely a CrimeStoppers tip that someone was selling drugs at the 1309 South Pearson Street residence, the officers' observation of Moses' green Lincoln at that location, and information from an informant (Graham, but his name was not disclosed in the warrant application) that Moses sold drugs from a house on Pearson Street. We therefore have little difficulty in concluding that the evidence remaining in the application for the warrant to search 1309 South Pearson Street supported a finding of probable cause. Indeed, at oral argument, Moses conceded that the second search would stand or fall with the first.

Moses also attacks the district court's emphasis with respect to the Pearson Street evidence that a key in Moses' possession opened the lock on the door. He contends that the district court was not entitled to rely on that evidence because the use of the key was part of the illegal entry into the residence. As he argues, the use of the key was not "the conclusion of a discre[te] investigative step to determine nothing more than whether the key operated a particular lock," but rather "the beginning of [an illegal] search." He argues therefore that the information gained from inserting the key into the lock should also have been stripped from the warrant application and that without that evidence, probable cause was lacking.

While the acts of *inserting the key* into the lock and *entering the house* were part of a continuous activity, the information obtained from inserting the key into the lock was nonetheless discrete from the information obtained from the illegal entry because the use of the key in the lock need not have led to entry of the residence at all. The officers could simply have tried the key and then left to obtain a warrant. If they improperly entered the residence (which the district court found they did), anything gleaned from the entry would obviously have to be excluded from the probable cause analysis (which it was). But the discrete act of inserting the key into the lock and discovering whether or not it fit did not offend the Fourth Amendment. *See United States v. Salgado*, 250 F.3d 438, 456 (6th Cir. 2001); *United States v. Concepcion*, 942 F.2d 1170, 1172-73 (7th Cir. 1991); *United States v. Lyons*, 898 F.2d 210, 212-13 (1st Cir. 1990); *cf. United States v. $109,179 in U.S. Currency*, 228 F.3d 1080, 1087 (9th Cir. 2000) ("[T]o the extent that [our earlier case] held that the insertion of the key into the lock was the beginning of a search, it is inapplicable here since there was no search that followed" (emphasis omitted)). Thus, regardless of the fact that use of the key facilitated the warrantless entry, the officer's insertion of the key into the lock served the discrete investigative purpose of confirming that Moses had access to the South Pearson Street residence.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

GREGORY, Circuit Judge, concurring in part and dissenting in part:

Because I find that no exigency existed in the moments prior to the officers warrantless entrance into Apartment 407-A ("407-A") and that there was not probable cause to search 407-A without the evidence secured during the warrantless

search, I respectfully dissent as to Part III of the majority opinion and concur as to the remainder of the opinion.

I.

"[T]he Fourth Amendment favors a warrant based on probable cause, but because the ultimate touchstone of the Fourth Amendment is reasonableness, the warrant requirement is subject to certain exceptions, as when exigent circumstances justify the warrantless search of a home . . . ." *Mora v. The City of Gaithersburg, MD*, 519 F.3d 216, 222 (4th Cir. 2008) (internal quotation marks and citations omitted). Indeed, "[i]t is well established that, even when officers have probable cause to believe that contraband is present in a home, a warrantless search of the home is unlawful unless exigent circumstances exist at the time of entry." *United States v. Mowatt*, 513 F.3d 395, 399 (4th Cir. 2008). The exigency exception applies when officers "have probable cause to believe that evidence of illegal activity is present and [ ] reasonably believe that evidence may be destroyed or removed before they could obtain a warrant," *United States v. Cephas*, 254 F.3d 488, 494-95 (4th Cir. 2001) or when "speed is essential to prevent escape or harm to police or others." *Mora*, 519 U.S. at 226. I first turn to the issue of whether any exigency existed on the night in question.

In ascertaining whether a "reasonable officer" would have found that an urgency existed, we focus on the officers' knowledge in the moments prior to commencing the search. The majority concedes that the intelligence available to the officers confirmed that Moses "d[id] not sell [drugs] out of his house and [that he] lives [in 407-A] by himself." (J.A. 229.) Despite this lack of actionable intelligence, the majority concludes that the officers reasonably believed that exigent circumstances precluded them from waiting for a search warrant. The following four events, all of which occurred on July 17, 2006, the night of Moses' arrest, convinced the majority that an exigency that clearly had not existed theretofore, suddenly

manifested: (1) As police approached Moses' vehicle, Moses was on the phone with his next door neighbor and cousin, Catressa Moore ("Moore"), (2) the "loud and unprovoked commotion" caused by Moore after multiple officers showed up at her doorstop asking to search her home, (3) the officers inability to see inside 407-A because Moses' blinds were drawn, and (4) the presence of an unidentified gold vehicle parked in front of Moses' apartment building.[1]

None of these facts, individually or collectively, transformed a controlled situation into one filled with exigency. With respect to Moses' phone call, there is nothing peculiar about making contact with a family member upon being stopped by the police; in fact, this is a natural reaction to the jolting experience of being pulled over by multiple officers. Moses responded truthfully to all of Officer Thomas Kroh's questions, providing him with the identity of the person he was speaking with on the phone, Moore, and giving the officer Moore's correct address. Presumably, if Moses had called his cousin to solicit her aid in destroying contraband located in his apartment, Moses would have been far less forthcoming with this information.

The district court and majority also rely on the fact that the commotion caused by Moore in Apartment 407-B ("407-B") may have alerted people in 407-A to the police presence. The majority's description of Moore's reaction to the officers as "loud and unprovoked" paints a distorted picture of what transpired at her apartment. As Moore explained to the officers, she "hated" Moses, and thus, it is hardly surprising that she reacted in a volatile manner to the appearance of multiple

---

[1]In addition to the cell phone call and the commotion caused by Moore cited by the majority, the district court found that the proximity of Moses' traffic stop to 407-A and the intelligence indicating that Moses used 407-A as a stash house for drugs and guns, provided support for the officers' conclusion that an exigent situation had arisen. I will briefly address these additional reasons below.

officers at her doorstep demanding consent to search her residence, ostensibly to confirm the existence of a passageway between Moore's and Moses' apartments. Despite her initial angst, Moore voluntarily allowed the officers to search her home, hardly the profile of someone trying to obfuscate the authorities' investigation. Considering the officers' finding that no passageway existed and Moore's obvious distaste for Moses, the idea that Moore created a commotion to alert another person in 407-A to the presence of the police in order to help her cousin, lacks credence. Unlike the situation in *United States v. Vasquez*, 638 F.2d 507 (2d Cir. 1980), where a suspected drug dealer mislead agents' into believing that him and his cohorts had come out of a second floor apartment when in fact the relevant apartment was located on the fourth floor, Moore did not deceive the officers. In addition, in *Vasquez*, during the ensuing melee in the second floor apartment, the officers realized that they had been bamboozled after the landlord informed them that the culprits' actually came out of an apartment on the fourth floor. Here, the officers did not have information from a reliable source (or any source for that matter) that a third party existed in 407-A.

The majority also relies on the fact that the officers could not see inside Moses' apartment. Once again, there is nothing illegal or even unusual about a person "shut[ting] up" the windows of his home to protect his privacy. The billions of dollars in annual sales generated by the blinds industry provides sound evidence that Moses is not alone in his desire to protect his home from the prying eyes of the public. Furthermore, Officer Goodykoontz ("Goodykoontz") had other information to rely on to dispel his hunch that another party was in 407-A. For example, despite standing in front of 407-A's door, Goodykoontz heard no sounds from inside the apartment. Critically, the moments during which Goodykoontz stood at 407-A's door listening for sounds overlapped with the time when Moore was allegedly creating a commotion next door. Thus, if a cohort of Moses was in 407-A, Moore's outburst should have tipped off the occupant to the police presence and

triggered the destruction of the contraband, a task that surely would have generated noise.

Finally, Goodykoontz stated during his cross-examination that "the gold car parked in front [of Moses' apartment]" (J.A. 73) was the reason for his suspicion that another person remained in Moses' apartment. Yet, this excuse seems to be exactly that: an excuse. It is incredulous that the officers did not run the gold car's license plates to identify its owner or in the alternative, at least query Moses and his cousin about who owned the gold car. Furthermore, the gold car was stationed in the parking lot of an apartment complex with a multitude of residents, not parked in front of a single family home's private driveway. Consequently, the location of the car in front of Moses' apartment does not lead to the inevitable (or even likely) conclusion that the owner of the gold car had any relationship with Moses. Indeed, Goodykoontz himself conceded that point when he admitted that "there was no evidence to show that somebody was actually in the apartment [after Moses and his girlfriend left] . . . ." (J.A. 78.)

Since the district court relied on our decision in *United States v. Turner*, 650 F.2d 526 (4th Cir. 2001), a comparison of the facts in both cases is worthwhile. In *Turner*, an informant told the police he personally observed one of the defendants, Gregory Turner ("Turner") selling drugs from his apartment; that Turner possessed a certain amount of cocaine on the night in question (the informant had purchased cocaine from the defendant that very night); that Turner would be leaving the apartment with the cocaine and transferring it to another location; and most importantly, he confirmed that Turner had an accomplice with him in the apartment.

After receiving this information, the police began to prepare a search warrant affidavit. Prior to the approval of the search warrant, Turner left the apartment and the police arrested him 300 to 400 feet from his apartment. While no cocaine was found on Turner, he informed the officers that his

accomplice remained in the apartment. At that stage, one of the police officers on the scene spoke with a state prosecutor who directed the officer to enter Turner's apartment immediately to arrest Turner's accomplice and prevent the possible destruction of the cocaine. The officer used Turner's keys to enter the apartment without a warrant. Because the officers reasonably believed that Turner's accomplice could have been aware of his arrest (due to the proximity of the arrest to the apartment) and possibly destroy the drugs prior to the delivery of the search warrant, we held that the exigent circumstances exception justified the officers' warrantless search.

As with all cases involving exigent circumstances, "the emergency circumstances will vary from case to case and the inherent necessities of the situation at the time must be scrutinized." *Turner*, 650 F.2d at 528 (internal quotation marks and citation omitted). Moses' situation can be easily distinguished from the situation in *Turner* on several counts including: (1) in the moments prior to the officers' warrantless entry into Moses' apartment, there was no reliable information that anyone remained in 407-A; (2) an occupant in 407-A could not have seen Moses' arrest; (3) no real-time eyewitness testimony existed to confirm that drugs existed in 407-A that night; and (4) Goodykoontz knocked on the door to 407-A while the other officers went to 407-B, and nobody answered; in addition, Goodykoontz failed to hear any audible sounds emanating from 407-A.

It is also noteworthy that after confirming that there was no access between 407-A and 407-B, the officers spent an indeterminate amount of time discussing their next move. During this time span, Goodykoontz asked Moses for consent to search 407-A, which he denied. According to Goodykoontz, at that point, he "took [Moses'] keys *to ensure that he had some right to [407-A].*" (J.A. 83) (emphasis added). After determining that Moses' key fit the keyhole, thus confirming that Moses did have a right to 407-A, Goodykoontz and Kroh nevertheless proceeded into 407-A to conduct a warrantless

"protective search" for the reasons stated above, though I find all of those reasons to be perplexing and wholly unconvincing. In addition, while Moses did have a violent criminal history, and Carl Kotay Graham ("Graham"), the head of Moses' gang, told the police that Moses stashed guns in his home, Moses was secured in the back seat of a police car and posed no threat to any of the officers. If officers can simply enter a person's domicile on the basis that the suspect has a violent criminal history, Fourth Amendment protections will no longer exist for the millions of American citizens who have a violent felony on their record.

Overall, we have held that five factors are relevant in determining whether exigent circumstances exist:

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that police are on their trail; and (5) the ready destructibility of the contraband.

*Turner*, 650 U.S. at 528 (citation omitted). Based on the facts above, no urgency exited in 407-A on July 17, 2006. Indeed, the officers admittedly had no evidence that anyone remained in 407-A after Moses and his girlfriend departed.[2]

Second, while a reasonable officer could believe that contraband was present inside 407-A, for the reasons stated above, no reasonable officer could fathom that there was someone in 407-A destroying the contraband. Third, as to the

---

[2]While the record confirms that Goodykoontz's surveillance of the Cedar Street Residence began at 2:45 p.m., and the warrant for 407-A issued at 5:40 p.m., there is no indication as to when Goodykoontz applied for the warrant.

possibility of danger to police guarding the site, contrary to the district court's finding, the fact that the officers spent time prior to the arrest and after the search of 407-B without calling for any back-up indicates that they did not feel any significant danger. In addition, there were multiple police officers standing outside 407-A to secure the immediate area around the apartment. Goodykoontz himself clearly felt comfortable approaching 407-A on his own while the other officers went to 407-B, further demonstrating that the officers themselves, like any reasonable officer under those circumstances, did not fear for their safety. Fourth, given the opportunity to destroy contraband, it is reasonable to conclude that most parties would do so upon learning of a police presence; however, in this case, there is no evidence that any person with such an opportunity actually existed. Finally, while the drugs could have been destroyed without much effort, the destruction of the firearms would have been virtually impossible.

Ultimately, the facts relied upon by the district court and the majority relate, ostensibly, to the distinct possibility that a previously unidentified person remained in 407-A after Moses and his girlfriend left his apartment on July 17, 2006, thus justifying the officers' warrantless entry. Looking at the facts known to the officers, both individually and cumulatively, I am left with a "definite and firm conviction" that the district court clearly erred in finding that reasonable officers could conclude that such a possibility existed. *Turner*, 650 F.2d at 528 (internal quotation marks and citation omitted).

## II.

Having found that exigent circumstances did not exist, I briefly turn to the issue of whether there would still be probable cause to search 407-A if the information gained from the warrantless search was struck from the search warrant affidavit. After excising the information gained from the protective search of 407-A, the following information remains in the affidavit: "intelligence" conveyed by a second officer to Goo-

dykoontz indicating that Moses used 407-A to store a "distributable amount of illegal narcotics and firearms"; a search of Moses after his arrest resulted in the discovery of four grams of marijuana in Moses' pant pocket; Moses possessed the key for 407-A, although he denied any connection with 407-A; Moses' criminal history, which included drug possession and concealed weapon charges; and Goodykoontz's extensive investigative experience in the narcotics trade.

Probable cause does not mandate "absolute certainty," *United States v. Gary*, 528 F.3d. 324, 327 (4th Cir. 2008), and exists if "a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). As to the intelligence, the affidavit does not contain any information as to the source of the intelligence, and as a result, the magistrate could not evaluate the reliability of the information.[3] This is critical to the probable cause determination because the most important background information on Moses came from this intelligence.

Second, the four grams of marijuana found on Moses is not a distributable amount, rather it is only sufficient for personal use. As such, without further information, this is not enough to suspect that Moses possessed a large quantity of narcotics in 407-A. With respect to Moses' criminal history, the search warrant only provided the magistrate with information that Moses had been charged with several prior counts of drug possession and three concealed weapon charges, including possession of a firearm by a felon. While the affidavit makes it clear that Moses was a felon, the affidavit does not indicate on what charges Moses was convicted. Consequently, the

---

[3]The record indicates that the intelligence came from Graham during an oral interview with an officer from the Greensboro Police Department. The search warrant stated that Goodykoontz "received information from Officer S. Richardson. . . ." that Moses was "dealing illegal narcotics and possessing firearms." (J.A. 235.)

magistrate would have had to assume that the charges against Moses resulted in guilty pleas or convictions in order to find such evidence persuasive. Thus, we are left with the fact that Moses failed to confirm his association with 407-A. While this factor is certainly relevant, it is not enough to establish a "fair probability" that Moses' residence contained contraband. Consequently, I would hold that without the evidence garnered during the protective search of 407-A, the officers did not have probable cause to enter Moses' apartment.

Since I would reverse the district court's denial of Moses' motion to suppress with respect to the warrantless search of 407-A, I respectfully dissent from Part III of the majority opinion, although I join my colleagues in the remainder of their opinion.