Filed 2/18/22  In re J.S. CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.S., a Person Coming Under the Juvenile Court Law. | H047756 (Santa Clara County Super. Ct. No. JV43645) |
| THE PEOPLE, Plaintiff and Respondent, v. J.S., Defendant and Appellant. | |

After a contested jurisdictional hearing, the court found that appellant J.S. (the minor) had committed the following offenses alleged in two juvenile wardship petitions (Petition A and Petition B) (Welf. & Inst. Code, § 602, subd. (a)).  From Petition A: robbery by means of force or fear (Pen. Code, § 212.5, subd. (c)),[1] carjacking a person 60 years of age or older (§§ 215, subd. (a), 1203.09, subd. (f)), and assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)).  From Petition B:  attempted carjacking while using a deadly or dangerous weapon (§§ 664, 215, subd. (a), 12022, subd. (b)(1)), attempted robbery while using a deadly or dangerous weapon (§§ 664, 212.5, subd. (c), 12022, subd. (b)(1)), and hit and run driving causing property damage (Veh. Code, § 20002, subd. (a)(1) & (a)(2)).  At the dispositional hearing, the juvenile

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

court adjudicated the minor as a ward of the court and committed him to the Santa Clara County Juvenile Rehabilitation Facility for the Enhanced Ranch Program (Ranch Program), finding his maximum term of confinement to be 14 years and 6 months.

On appeal, the minor contends that statements he made to police were obtained in violation of *Miranda*[2] and Welfare and Institutions Code section 625.6, and were involuntary under the due process clause of the Federal constitution.  The Attorney General disagrees and maintains that the statements were admissible.  The minor also contends that his maximum term of confinement should have been calculated as being 11 years and 6 months, not 14 years and 6 months at the time of disposition.  In addition, from that number, he argues that the maximum period of confinement should be further reduced to 7 years and 6 months pursuant to retroactive application of Senate Bill No. 823 (Stats. 2020, ch. 337, §§ 28, 53) (Senate Bill No. 823).  The Attorney General concedes that under Senate Bill No. 823, the minor's maximum term of confinement should be reduced to 7 years and 6 months.

We conclude that there was no *Miranda* violation because there was no custodial interrogation, and that the statements were made voluntarily.  We agree with the parties that a new disposition order must be issued, reflecting a maximum term of confinement of 7 years and 6 months.

I.    **FACTUAL BACKGROUND**

A.    ***Facts underlying Petition A***

Hector E., who was 73 years old at the time of trial, testified that on the morning of April 3, 2019, he was unloading groceries from the trunk of his Nissan Sentra when he saw "two kids across the street with hoodies walking up the street . . . ."  As Hector was removing groceries from his car, he heard someone say " 'give me your keys to your car.' "  Hector replied, " 'what?' " and the young man repeated, "give me the keys to

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

2

[your] car." The young man, who was wearing a black hoodie over a white t-shirt, "look[ed] a lot like" the minor. The young man, like the minor, had a "[r]eal light skin tone" and had a "similar" face. "[T]he other kid, he did not come across the street with him, he stayed over there on the other side."

Hector told the young man that he would not give him his keys. The young man then "pulled up his shirt and showed me his weapon," which looked like a gun. Hector "told him that he was on camera" and indicated toward the camera, but the young man replied, " 'I don't care.' " Hector replied that he "didn't care if he had a gun, he was not going to have my keys." The young man grabbed the keys, which broke off from the key ring, leaving Hector holding the car's wireless remote.

The young man opened the car door and "jumped into the car . . . ." Hector moved to pull the young man out of the car, and a struggle ensued. The young man punched Hector in the face, which broke his glasses, and he "couldn't see very much anymore . . . ." Hector disengaged, but the young man left the car, followed Hector, and kept hitting Hector. Hector, who was now bleeding, went to a "little patch of grass" next to his driveway, fell on his hands and knees, and tried to catch his breath. He heard the car leave and pressed the alarm button on the wireless remote, causing the car alarm to sound as it drove away. Hector called 911, and the police responded. He showed them the surveillance video from the outside of his home.

While police were still at Hector's house, Hector's car was involved in an accident. A detective went to the intersection where the collision occurred, but the car was not there. The detective recovered surveillance video from a nearby Mi Rancho Supermarket, which depicted the parking lot, the front entrance, and a partial view of the road. The surveillance video showed someone in a black hoodie running through the parking lot.

In early April 2019, Martha Guerrero, the principal of Mt. Pleasant High School, received a text message with a photo from a police officer who works at the school. The

3

photo was of a young man, and the police officer asked Guerrero if she recognized the student. She thought she recognized the student, but looked at the school's security camera footage to refresh her memory. She replied that she had spoken to a student earlier that day who had similar clothing, and she sent the officer a photo of the security footage. She recalled that it was early in the morning, 9:00 or 9:30 a.m., when she saw the student sitting by himself outside the attendance office. She asked him why he was not in class, and the student "got up and was walking like he was going to class." Two staff members who viewed the school surveillance video identified the minor as the student in the video. Guerrero then looked the student up in the student information system, which included an updated photograph, and was "comfortable" that the minor was the student she talked to that morning.

On the evening of April 3, 2019, the police executed a search warrant at the minor's home to look for, among other things, a black semiautomatic pistol and a black hoodie sweatshirt. The minor told police that the gun was under his mattress,[3] and police recovered "a BB or pellet-type pistol, [but] it was not a[n] actual firearm."

Hector's car was later recovered, and police lifted fingerprints from it. One of the prints was identified as matching the right little finger of the minor. A grey-colored backpack was recovered from the car. The backpack contained a notebook with the name "Israel [H.]" written on it and paperwork from Mt. Pleasant High School. Police reviewed body-worn camera video of prior contacts with the minor. A video showed the minor wearing a gray Jansport backpack during a police contact in February 2019. A photograph of the young man in the black hoodie from Hector's driveway showed the young man wearing a grey backpack. In the surveillance video of the Mi Rancho Supermarket parking lot, the individual wearing the black hoodie was not wearing a backpack.

[3] The search of the residence and the minor's statements made during that search will be discussed in greater detail below.

4

### B.    Facts underlying Petition B

On March 20, 2019, Ana S., who was six months pregnant, drove her mother and daughter to a school to pick up her nieces. She parked her 2008 Dodge Charger outside of the school. Her mother and daughter left the car. Ana was in the driver's seat with the ignition off when four teenagers approached the car. Two of them stood behind a Jeep that was parked behind her car, while the other two approached her vehicle. One of the teenagers approached the driver's side window, pulled out a knife, pointed it close toward her face, and told her to get out of the car. Ana looked at him and said, " 'Really?' " The teenager replied, " 'Yes. Get out of the car,' and then [Ana] told him 'Do you really want to do this? I'm pregnant.' " The teenager said, " 'Yes, get out.' " Ana got out of the car.

The teenager got into the driver's seat and tried to turn on the car. However, Ana "had a feeling something was going to happen" and had turned on her car already. The teenager in the driver's seat was distracted so Ana reached across the driver's seat to grab her purse and started hitting him with it. He eventually got the car into gear but by then another car had pulled in front of Ana's car to block it in. The teenager accelerated into the car, then reversed, and went backwards onto the sidewalk where it hit a pole and stopped. At some point, Ana fell and ended up on the ground, with her chest where the door was and her body under the car. The four teenagers then fled on foot. Ana went to the emergency room. Both she and the baby were fine.

Later, Ana saw a video on Facebook of "[a] teenager trying to take—like wrestling with an older guy, trying to steal his vehicle." She called police because the video looked so similar to what happened to her. She eventually went to the police station, looked at six photographs, and identified the person who tried to take her car. She was not told at the time the name of the person she identified. However, at trial, Ana identified the minor in court as the person who tried to take her car. She stated she "can't forget" his face and described herself as "[a] hundred percent" certain that she was identifying him based on her recollection of the event, as opposed to the photos and videos she saw.

5

### C. *Facts underlying Petition C*

On March 20, 2019, Minh Q. returned home in his Toyota Camry. After he parked and got out of his car, two young men approached him, and one of them asked Minh to give him the keys. One of the men stuck his hand in his pocket. Minh "was very scared when [he] saw him sticking his hand in a pocket." He later told police that one of the men had a folding pocket knife and held the knife toward Minh's torso. However, at trial, Minh denied seeing any weapons. Minh handed over his keys. One of the men told Minh to go away, so Minh went to his house and called the police.

Minh described the man who spoke to him as 16 or 17 years old and "Mexican-like." Minh denied telling police that the man was wearing a black hoodie. He instead described the perpetrator's clothes as "sort of greyish in color." Minh denied telling police that he saw the person who took his keys get into the passenger seat. Minh was shown photographs of people by the police but did not recognize anyone. The encounter was very brief and Minh stated he "didn't see clearly."

Minh's car was later recovered approximately two blocks or one-tenth of a mile away from the minor's home. A fingerprint lifted from the exterior passenger door of the car matched the left ring finger of the minor.

## II. PROCEDURAL BACKGROUND

On April 5, 2019, the Santa Clara County District Attorney filed a juvenile wardship petition, Petition A, alleging that the minor committed the following offenses on or about April 3, 2019: (1) robbery of Hector E. by means of force or fear (§ 212.5, subd. (c)); (2) carjacking of Hector E., a person 60 years of age or older (§§ 215, subd. (a), 1203.09, subd. (f)); (3) assault by means of force likely to produce great bodily injury against Hector E. (§ 245, subd. (a)(4)); (4) hit and run resulting in injury; and (5) and (6) two counts of exhibiting an imitation firearm (§ 417.4).

On April 22, 2019, the District Attorney filed a second petition, Petition B, alleging that the minor committed the following offenses on or about March 20, 2019:

(1) attempted carjacking of Ana S., while using a deadly or dangerous weapon (§§ 664, 215, subd. (a), 12022, subd. (b)(1)); (2) attempted second degree robbery against Ana S., while using a deadly or dangerous weapon (§§ 664, 212.5, subd. (c), 12022, subd. (b)(1)); and (3) and (4) two counts of hit and run driving causing property damage (Veh. Code § 20002, subd. (a)(1) & (a)(2)).

On May 7, 2019, the District Attorney filed a third petition, Petition C, alleging the minor committed the following offenses on or about March 20, 2019: (1) carjacking of Minh Q., while using a deadly or dangerous weapon (§§ 215, subd. (a), 12022, subd. (b)(1)); and (2) robbery in the second degree against Minh Q., while using a deadly and dangerous weapon (§§ 212.5, subd. (c), 12022, subd. (b)(1)).

The juvenile court granted the prosecution's motion to dismiss counts 5 and 6 (exhibiting an imitation firearm) in Petition A prior to the contested jurisdictional hearing. At the end of the jurisdictional hearing, the prosecutor moved to dismiss count 4 (hit and run resulting in injury) in Petition A on the ground that the prosecution had produced no evidence as to the offense. Over the minor's objection, the court granted the motion.

At the conclusion of the jurisdictional hearing, the juvenile court sustained Petitions A and B, but found that Petition C had not been proven beyond a reasonable doubt and therefore did not sustain Petition C. The minor was declared a ward of the court and committed to the Ranch Program for a maximum term of 14 years and 6 months.

The minor filed a timely notice of appeal.

III.   **DISCUSSION**

    *A.*   *Miranda*

        *1.*   *Factual Background*

On the evening of April 3, 2019, the police searched the minor's home and recovered a "BB or pellet-type pistol" in the minor's bedroom underneath the mattress.

The team executing the warrant included San Jose Police Detective Jonathan Byers, other robbery detectives from his department, as well as officers from the "covert response unit." They were seeking a black semiautomatic pistol and any other evidence associated with the carjacking of Hector's car. When the police officers arrived, the minor was arrested and held with his mother and three siblings outside of the house while the search was carried out. All of them were kept in handcuffs, except for the minor's youngest sibling, who was 10 years old.

A transcript was prepared of San Jose Police Detective Gerardo Silva's body-worn camera footage from the night of the search. The transcript reflected that Silva spoke to the minor's mother in Spanish. The mother spoke only Spanish. Silva asked the mother if she had seen the minor go to school that day. The mother replied that she had seen him. Silva then told the mother "we're here because these photos were taken from a video of [the minor] stealing a car from a man and hitting him in the face. The man is, I'm not good with numbers in Spanish, he's 73 years old. The video shows him stealing the car and the man said he had a gun when he stole it. When this happened—" The mother interrupted by saying the minor's name. Silva continued, "He went to school but the school told us that he didn't go to any of his classes. We talked to his school. On the video at school. He leaves at 8:30 and he steals the car and crashes [it] after that. Someone following him on foot after he crashed the car, he shows the gun and that's also on video. That's why we're here because we need to—" The mother interjected, "[The minor] stole a car?" Silva answered, "Yes. I don't know why. I don't know—I know he hasn't been in trouble or anything in the past. I don't know why he did it, but we have it all on video. We showed the school the same photos and they said it was [the minor]. We got a warrant from the judge to search the house for the gun. We don't want anyone . . . hurt. Okay, so I don't know—I'm not saying that he's a bad person or anything like that, it's just what we have to do so no one gets hurt." Silva then went on to describe the

arrest and arraignment process for the minor, and he said he would give her a card and copy of the search warrant.

The mother then asked Silva, "Can I talk to him right now . . . over here?" Silva replied, "No, we're no—what?" The mother then said, "Can I talk to him? I mean—" Silva answered, "Let me check [if] he's still here." The mother then pointed to and identified her son. Silva said, "Okay, let me check if that's okay, if it, then you can, okay?" Silva then spoke with a sergeant, telling him that the minor's mother wanted to "talk to [the minor] real quick." The sergeant replied, "Okay."

The mother then twice asked the minor, "Why did you do that?" The minor first said, "Huh?" And then said, "I don't know." The mother then asked if the minor stole a car and did not go to school. The minor said "No" to each question. The mother then said, "And you stole a car? I saw you . . . . He hit the car owner?" Silva said, "I'm sorry?" The mother again asked, "You said he hit the car owner." Silva responded, "Yes." The mother then said, "You hit . . . him and you took the car." Silva interjected, "Ma'am, the faster we find the gun, the faster we can leave and you can get [to] go to bed." The mother then asked, "Where did you get the gun?" The minor denied having a gun. The mother asked him again about the gun. He again denied having a gun. The mother asked two more times about the gun, and the minor continued to deny having one. The mother asked "[W]ho gave it to you?" The minor responded, "No one."

The mother continued, "Do you see the trouble you're in? Why did you do it? What did you gain from stealing a car? What did you gain from it? Tell me, what did [you] gain? Where did you get that car? Where did you get that car . . . ?" Then, directing a question to Silva, the mother asked, "Where did he steal the car?" Silva answered, "Close to the school." The mother then asked Silva several questions about the carjacking, and Silva responded to each question. The mother repeated her questions to the minor, asking "Where did you get a gun? What were you thinking? What did you gain from that? I'm the one who has to look after you—" The sergeant then asked Silva

9

in English, "Has she been told what's going on?" Silva replied, "Yeah—" The sergeant interjected, "She knows the crime and all?" Silva responded, "She's questioning on her own."

The mother continued to question the minor: "And this is [what] you do?" Silva, speaking to the sergeant, observed, "She decided to question him on where the gun's at[.]" The sergeant said, "Okay." The mother continued, "I've never seen a gun in the house, [J.S.]. I need you to tell me where you got it from?" The sergeant then said, speaking to Silva, "Did you tell her that we don't want to tear up her house?" Silva responded, "Yeah." The sergeant continued, "If we get the gun, we leave?" Silva said, "Yeah, I told her that." The sergeant added, "Otherwise we're gonna tear her house up to find it?" The mother continued to speak to the minor while Silva and the sergeant spoke, asking the minor, "Where did you get it, [J.S.]?" Silva, still speaking with the sergeant, said "Yeah." The mother again asked, "Where did you get it? Who gave it to you?" The minor responded, "No one gave me anything. Fuck." The mother said, "Then?" The minor said, "Okay, stop asking me questions." Silva, speaking toward the mother, said "Ma'am—" but was interrupted by the sergeant, who asked, "Does she speak English at all?" Silva asked the mother in Spanish if she spoke English, and she said she spoke none.

The sergeant then said, "Okay, let her know that I'm sergeant. Let her know that we have to go through every square inch of that house, every square inch, we're talking every closet, everything's gonna be tossed upside down. We have to find that gun." Silva then translated the statement to Spanish. The sergeant continued, "We don't want to do this to her house and I'm sorry." Silva translated again. The mother, speaking now to the minor, said, "You might as well tell me because they're gonna check the whole house." The sergeant then added, in English, "If we find it, we'll let the children go back in, they can resume their night, go to bed. It's gonna be unfortunate for mom and dad to have to deal with what he's going through but we can get out of their hair for tonight and

10

let them go back in their house. We just—" The minor interrupted, saying, "All right, that shit's on my bed." Silva said, "Huh?" The minor clarified, "It's in my bed. Inside my bed." Silva relayed this information to another officer.

## 2. *Procedural Background*

The minor moved to suppress the statements he made during the execution of the search warrant, arguing that his statements were obtained in violation of his Fifth Amendment right against self-incrimination because he was not advised of his *Miranda* rights. He also argued that the statements were taken in violation of his statutory rights under Welfare and Institutions Code section 625.6, and that the statements were involuntary. The prosecution opposed the motion, arguing that there was no custodial interrogation because the mother was not a member of law enforcement and that there was no coercive conduct.

The juvenile court denied the motion to suppress. The court concluded that the mother had not acted as an agent of law enforcement. Rather, she initiated questioning of her own volition, and while the police at times communicated during her questioning of the minor, it was to briefly answer clarifying, fact-based questions about the alleged crime. As for the police comments about the impending search, the court found "there [was] no basis for concluding such commentary qualifies as conduct beyond that normally attendant to an arrest and execution of a search warrant." Further, the court found that Welfare and Institutions Code section 625.6 was by its own terms not implicated because there was no custodial interrogation. Finally, the court concluded that the minor was not subject to coercive tactics by police; rather, his "statements were responsive to unilateral questioning by his own mother."

## 3. *Legal Framework*

In reviewing a court's "decision on a *Miranda* issue, we accept the trial court's determination of disputed facts if supported by substantial evidence, but we

11

independently decide whether the challenged statements were obtained in violation of *Miranda*." (*People v. Davis* (2009) 46 Cal.4th 539, 586.)

"It is settled that *Miranda* advisements are required only when a person is subjected to 'custodial interrogation.' [Citations.]" (*People v. Davidson* (2013) 221 Cal.App.4th 966, 970) "An interrogation is custodial when 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' [Citation.] The test for *Miranda* custody is, ' "would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." ' [Citation.] The objective circumstances of the interrogation are examined, not the ' "subjective views harbored by either the interrogating officers or the person being questioned." ' [Citation.]" (*People v. Kopatz* (2015) 61 Cal.4th 62, 80.)

"[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301-302, fns. omitted.)

In *Innis*, the defendant was arrested in connection with a gun-related murder and robbery. (*Innis*, *supra*, 446 U.S. at p. 293.) He was given the *Miranda* advisements, and

placed in a police car to be transported to the police station. (*Innis*, at p. 294.) Three officers were tasked with taking him to the station, and were instructed not to speak to him. En route to the station, two of the police officers had a conversation about the search for the gun. (*Id.* at pp. 294-295.) One of the officers stated that there was a school for handicapped children nearby and expressed concern that one of them might find the weapon and hurt themselves. (*Ibid.*) The other officer agreed. The defendant then volunteered the location of the gun, explaining "he 'wanted to get the gun out of the way because of the kids in the area in the school.' " (*Id.* at p. 295.)

The United States Supreme Court determined that the defendant "was not 'interrogated' within the meaning of *Miranda*." (*Innis*, *supra*, 446 U.S. at p. 302.) As an initial matter, it was "undisputed that the first prong of the definition of 'interrogation' was not satisfied, for the conversation between [the two officers] included no express questioning of the [defendant]." (*Ibid.*) Further, the Court concluded "it cannot be fairly concluded that the [defendant] was subjected to the 'functional equivalent' of questioning" because the officers could not have known "that their conversation was reasonably likely to elicit an incriminating response from the [defendant]." (*Ibid.*) The court noted that there was "nothing in the record to suggest that the officers were aware that the [defendant] was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children. Nor is there anything in the record to suggest that the police knew that the [defendant] was unusually disoriented or upset at the time of arrest." (*Id.* at pp. 302-303.) The Court also pointed out that the conversation was brief, as opposed to a "lengthy harangue," and the officers' comments were not particularly " 'evocative.' " (*Id.* at p. 303.) Although the Court acknowledged that the defendant may have been subjected to " 'subtle compulsion,' " and that apparently the officers' conversation "struck a responsive chord," that was not the equivalent of interrogation. (*Ibid.*) In sum, "it must . . . be established that a suspect's incriminating response was the

13

product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." (*Ibid.*)

In *United States v. Thierman* (9th Cir. 1982) 678 F.2d 1331 (*Thierman*), the defendant was suspected of involvement in several crimes, including credit card fraud and post office burglaries. (*Id.* at p. 1332.) The defendant was arrested and given the *Miranda* advisements. Police began to question him. The defendant stated he would "turn over the money orders in the morning if [his girlfriend] was left out of it." (*Thierman*, at p. 1332.) The defendant eventually indicated he wanted to speak to his attorney, and the questioning ceased. (*Ibid.*) The officers continued to search the apartment, and no one asked the defendant any questions. (*Id.* at p. 1333.) "The officers discussed in [the defendant's] presence, however, that they were going to have to contact [the defendant's] family, friends and acquaintances about the case. During the course of the conversation, one of the officers apparently stated it was too bad that [the defendant's girlfriend] had to become involved." (*Ibid.*) Several minutes later, the defendant gave a statement about one of the robberies and led the police to the money orders. (*Ibid.*)

The Ninth Circuit Court of Appeals rejected the defendant's argument that the officers' conversation in his presence constituted interrogation. (*Thierman*, *supra*, 678 F.2d at p. 1336.) The court noted the similarities to *Innis*: "In both cases, the conversations were brief and concerned the likely course of the police investigation and the possible consequences of the suspect's failure to cooperate with the police." (*Ibid.*) The court disagreed with the defendant's argument that his "concern about family and friends becoming involved in a criminal investigation creates a 'peculiar susceptibility.' Most people in [the defendant's] position would share his concern." (*Id.* at p. 1337.) The court also found that "the record does not indicate that the police knew that [the defendant] was particularly upset or disoriented when they conversed in his presence." (*Ibid.*)

14

### *4.* *Officers' Statements*

The parties do not dispute that the minor was in custody when he made the statements about the location of the alleged firearm. Rather, the minor argues that "Detective Silva and the unnamed sergeant both communicated repeatedly" with him when they spoke, in English and Spanish, about the course of the search. He contends that although the statements were ostensibly directed at his mother, the statements were actually directed at him and eventually succeeded in breaking his will.

Here, as in *Innis* and *Thierman*, Silva's and the sergeant's comments did not rise to the level of an interrogation. The comments were brief and pertained to the purpose and scope of the ongoing investigation, and the actual consequences of the need to find the weapon. (See *United States v. Hull* (8th Cir. 2005) 419 F.3d 762, 767 ["[W]e generally do not find a mere factual statement to be an interrogation where it serves to inform the suspect as to the status of his case or the investigation into his activities."]; *United States v. Washington* (9th Cir. 2006) 462 F.3d 1124, 1134 ["*Miranda . . .* does not preclude officers from informing the defendant about evidence against him or about other information that may help him make decisions about how to proceed with his case."].) Moreover, the comments were almost entirely directed at and in response to the mother's questions about the investigation. Finally, any concern about the inconvenience of the search of the house for the minor's family would be a concern shared by most people in his position. It was not a peculiar susceptibility. There is nothing in the record to indicate that Silva and the sergeant should have known that their comments were reasonably likely to evoke an incriminating response. Thus, because the minor was not subject to an interrogation, his statements about the location of the alleged firearm were not taken in contravention of *Miranda*.

The minor also contends that law enforcement violated Welfare and Institutions Code section 625.6, subdivision (a). In relevant part, it provides, "Prior to a custodial interrogation, and before the waiver of any *Miranda* rights, a youth 17 years of age or

15

younger shall consult with legal counsel in person, by telephone, or by video conference." By its very terms, this section applies only to *custodial interrogations*. Accordingly, because the minor was not interrogated by law enforcement, this statutory provision was not violated.

### 5. *The Mother's Questioning*

In addition to challenging the officers' statements to the minor, the minor also contends that the officers' words and actions turned *his mother's questioning* into the functional equivalent of an interrogation.

" '[T]he constraints of the . . . Fifth Amendment[ ] do not apply to purely private activity.' [Citation.] But 'the government can exercise such control over a private actor that a "private" action can fairly be attributed to the government for purposes of the . . . Fifth Amendment.' [Citation.] A defendant must demonstrate 'that, in light of all the circumstances, [the private individual] acted as an instrument or agent of the government.' [Citation.] . . . . A defendant satisfies this test 'by showing that the government exercised such coercive power or such significant encouragement that it is responsible for [the private individual's] conduct, or that the exercised powers are the exclusive prerogative of the government.' [Citation.] . . . ." (*United States v. Sanchez* (8th Cir. 2010) 614 F.3d 876, 886.)

In *Arizona v. Mauro* (1987) 481 U.S. 520 (*Mauro*), the defendant was taken into custody and given the *Miranda* advisements. He refused to answer any questions until a lawyer was present. The defendant's wife, who was being questioned in another room, asked to speak with him. The officers brought her into the interrogation room, turned on a tape recorder, and remained in the room. The defendant then made incriminating statements to his wife, which the prosecution later sought to introduce at trial. Relying on *Innis*, the Arizona Supreme Court ruled the statements were inadmissible. It reasoned that allowing the defendant to speak with his wife was the " 'functional equivalent' " of

16

interrogation because the officers knew that " 'if the conversation took place, incriminating statements were likely to be made.' " (*Mauro*, at pp. 525-526.)

The United States Supreme Court reversed. The court noted that there was "no evidence that the officers sent [the defendant's wife] in to see her husband for the purpose of eliciting incriminating statements." (*Mauro*, *supra*, 481 U.S. at p. 528.) Rather, the evidence showed that officers " 'yielded to her insistent demands' " to see the defendant. (*Ibid.*) While it was correct to say "that there was a 'possibility' that [the defendant] would incriminate himself while talking to his wife," and that officers were certainly "aware of the possibility," the court determined that "[o]fficers do not interrogate a suspect simply by hoping that he will incriminate himself." (*Id.* at pp. 528-529.) The court concluded that the defendant "was not subjected to compelling influences, psychological ploys, or direct questioning. Thus, his volunteered statements cannot properly be considered the result of police interrogation." (*Id*. at p. 529.)

In *United States v. Kimbrough* (4th Cir. 2007) 477 F.3d 144 (*Kimbrough*), the defendant was detained at a home after a report that drugs were being sold there. (*Id.* at pp. 145-146.) The defendant was arrested in the basement after officers observed the defendant dividing cocaine on a plate with a razor blade. (*Id.* at p. 146) Officers brought the defendant's mother downstairs to show her what they had found. She "appeared genuinely 'shocked and surprised' and asked to speak to her son." (*Ibid.*) The defendant was brought back downstairs, and his mother proceeded to ask him questions such as, " '[W]hat is this[?]' " and " '[I]s there anything down here?' " (*Ibid.*) An officer attempted to recite an ultimately ineffective rendition of the *Miranda* advisements from memory. (*Kimbrough*, at pp. 146, 151.) The defendant proceeded to answer questions posed by his mother while looking at one of the officers, leading to the discovery of a gun, more cocaine, and cocaine packaging material. (*Id.* at p. 146) The district court found that the *Miranda* advisements were ineffective and that the mother's questioning

was the equivalent of an official custodial interrogation, and it suppressed the defendant's statements and evidence derived from those statements. (*Kimbrough*, at pp. 146-147.)

The Court of Appeals reversed. The court rejected the defendant's argument that by bringing his mother "to the basement to see the drugs, the police orchestrated a series of events that culminated in [her] asking to speak to her son, questioning him, and eliciting his inculpatory responses in the presence of police." (*Kimbrough*, *supra*, 477 F.3d at p. 150.) The court first noted that the defendant "cites no cases, nor can we locate any, in which statements or confessions elicited through private questioning have been suppressed." (*Ibid.*) "We [also] cannot say that the officers should have known that showing [the mother] the drugs in her house would coerce an incriminating response from her son. . . . Although perhaps a fortuitous consequence from the officers' perspective, it was no more so than the situation in *Innis*, and the actions of the officers here were arguably less calculated." (*Kimbrough*, at p. 151.) "Moreover, there is no evidence in the record of a tacit agreement, discussion, or understanding between the police officers and [the mother] that she would ask questions or attempt to elicit incriminating information." The court observed that the mother "had personal motivations for interrogating [her son]," including "the natural anger of a mother who discovers that her son is involved with drugs" and the responsibility of maintaining her home. (*Ibid.*)

Here, as in *Mauro* and *Kimbrough*, the mother's questioning of the minor was not the functional equivalent of a custodial interrogation. Importantly, the mother initiated questioning of the minor of her own accord, and did so without encouragement or solicitation. In fact, Silva was initially not even sure if the minor was still at the scene and could even be questioned by the mother. The questioning, while persistent, was clearly driven by the mother's desire to speak to her son about the crime and to make sure that any firearm in her home was found expeditiously. To the extent that Silva and the sergeant spoke during her questioning, it was to answer fact-based questions from the

18

mother and to provide factual statements about the object of the search and how it would be carried out. While Silva may have recognized the possibility the minor might make an inculpatory statement when he noted to the sergeant, "[s]he's questioning on her own," "[o]fficers do not interrogate a suspect simply by hoping that he will incriminate himself." (*Mauro*, *supra*, 481 U.S. at p. 529.)

In sum, the mother's questioning was not the functional equivalent of a custodial interrogation, and she did not act as an instrument or agent of law enforcement. Thus, the minor's inculpatory statements made in response to the mother's questioning were not the result of police interrogation, and the statements were not taken in violation of *Miranda*.

### B.    *Voluntariness of Statements*

The minor argues that his inculpatory statements were involuntary, in violation of his due process rights under the Fourteenth Amendment.

An involuntary statement is inadmissible. " ' "A statement is involuntary if it is not the product of ' "a rational intellect and free will." ' [Citation.] The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.' " ' [Citations.] [¶] ' "A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence. [Citation.] Although coercive police activity is a necessary predicate to establish an involuntary confession, it 'does not itself compel a finding that a resulting confession is involuntary.' [Citation.] The statement and the inducement must be causally linked. [Citation.]" [Citation].' [Citation.] A confession is not rendered involuntary by coercive police activity that is not the 'motivating cause' of the defendant's confession. [Citation.] 'The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made.' [Citation.] 'Whether a confession was voluntary depends upon the totality of the circumstances.' [Citations.] 'On appeal, we conduct an independent

19

review of the trial court's legal determination and rely upon the trial court's findings on disputed facts if supported by substantial evidence.' [Citation.] The facts surrounding an admission or confession are undisputed to the extent the interview is tape-recorded, making the issue subject to our independent review." (*People v. Linton* (2013) 56 Cal.4th 1146, 1176-1177.)

The minor identifies several considerations that he argues rendered his confession involuntary. He highlights his youth at the time of the search warrant execution, noting that he was 14 years old. He asserts that he has had minimal experience with law enforcement. He contends that law enforcement overbore his will by using coercive techniques and by urging his mother to continue questioning.

We do not agree with the minor that the officers used coercive techniques to elicit statements about the location of the alleged firearm. "It is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied. [Citations.] However, mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary. [Citation.] The distinction that is to be drawn between permissible police conduct on the one hand and conduct deemed to have induced an involuntary statement on the other 'does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth as represented by the police.' [Citation.] Thus, '[when] the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct,' the subsequent statement will not be considered involuntarily made. [Citation.] On the other hand, 'if . . . the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible . . . .' [Citations.]" *(People v. Jimenez*

20

(1978) 21 Cal.3d 595, 611-612, overruled on other grounds in *People v. Markham* (1989) 49 Cal.3d 63, 71 and *People v. Cahill* (1993) 5 Cal.4th 478, 509-510, fn. 17.)

In *People v. McWhorter* (2009) 47 Cal.4th 318 (*McWhorter*), the defendant was charged with murder. (*Id.* at p. 324.) The defendant claimed his confession was involuntary because police " 'threatened' to call his mother as a witness in the case unless he confessed." (*Id.* at p. 348.) "Defendant responded that he did not want his mother involved. [The police] at one point commented to [the] defendant, 'Like I say, you know. Yes, we're gonna talk to your mom. Because, because you, you pulled her in this. I didn't pull her in this. You said that . . . you went down to meet your mom. Your mom gave you some money, lent you some money. . . . And you wanted me a while ago not to involve your mom. Now if you stick with that story and you don't tell me why you did it, yeah, your mom's gonna be on the stand. Because you pulled her in it. I didn't. I didn't make up your mom's, uh, name. I didn't make up your mom's story. So if you want her to ride this roller coaster with you because all of a sudden you're afraid of, of—' " (*Ibid.*)

Our high court determined that the confession was not involuntary. In rejecting the defendant's claim, the *McWhorter* court explained: "With regard to the comments about [the] defendant's mother, we do not read [the police]'s remarks as 'threatening' to involve her as a witness in the case unless defendant confessed. Rather, the officers, in essence, were telling defendant that by lying about having borrowed the money from his mother, *he himself was involving her in the case as a potential witness, which was an accurate observation.*" (*McWhorter, supra*, 47 Cal.4th at pp. 348-349, italics added.) Moreover, officers could " 'appropriately state as fact that because of comments he's made, . . . as a result thereof he is bringing others into the picture, including his mother,' " and also could properly " 'challenge him to . . . change that information or admit that it's inaccurate information.' " (*Id.* at p. 349.)

In this case, insofar as Silva's and the sergeant's statements could be construed as being said toward the minor, the statements did not contain any implied threat or promise.

Officers did not promise lenient treatment or suggest any benefit to the minor if the alleged firearm was found expeditiously, nor did they threaten additional punishment based on a lack of cooperation. Rather, the officers accurately observed that upon finding the weapon, law enforcement could stop searching the house and allow the minor's siblings and mother to go back inside.

As for the minor's youth, although this factor generally renders one more " ' " susceptible to influence" ' " and " ' "outside pressures" ' " (*In re Elias V.* (2015) 237 Cal.App.4th 568, 586-587), a "minor [nonetheless] has the capacity to make a voluntary confession." (*In re Jessie L.* (1982) 131 Cal.App.3d 202, 215.) "The admissibility of such a statement depends not upon his age alone but a combination of that factor with other circumstances such as his intelligence, education, experience, and ability to comprehend the meaning and effect of his statement." (*Ibid.*) Although the minor apparently did not have prior criminal experience, there was no evidence that he had below average intelligence or any impediments that would prevent him from making a voluntary statement. Moreover, the minor's statements were made not inside an interrogation room or police station, but at his home in the presence of his mother. (*Miranda*, *supra*, 384 U.S. at pp. 449-450 [noting that successful interrogations " 'should take place in the investigator's office,' " not at a suspect's home, as " 'he may be confident, indignant, or recalcitrant,' " and the presence of " 'family and other friends . . . nearby' " lends " 'moral support.' "]; *In re Anthony L.* (2019) 43 Cal.App.5th 438, 454 [finding that the minor's statements were voluntary because, among other things, the minor was questioned at home with his mother in the room].) In the absence of any other factors suggesting an unusual susceptibility, the minor's relative youth alone does not compel a finding that his statements were involuntary.

In sum, there was no coercive police activity, and the totality of the circumstances does not support the contention that the minor's will was overborne. Thus, the minor's

22

subsequent inculpatory statements were voluntary and admissible, and there was no violation of his due process rights.

### C. Maximum Term of Confinement

The minor contends that the maximum term of confinement should have been calculated at the time of disposition as being 11 years and 6 months, not 14 years and 6 months. He argues that the terms for the robbery and attempted robbery counts should have been stayed pursuant to section 654. The Attorney General agrees.

### 1. Procedural History

The juvenile court committed the minor to the Ranch Program for a maximum term of 14 years and 6 months. The court did so by adopting the probation department's calculation without further explanation.

The robbery count (count 1) in Petition A concerned the taking of "personal property, car keys, in the possession of Hector E[.]," during the carjacking. The carjacking count (count 2) concerned the taking of "a motor vehicle in the possession of Hector E[.]"

The attempted carjacking count (count 1) in Petition B concerned the attempt to take Ana S.'s vehicle, while the attempted robbery count (count 2) concerned the taking of her "personal property" and "car."

### 2. Analysis

Under Welfare and Institutions Code section 726, subdivision (d)(1), when a juvenile court removes a minor from the physical custody of his or her parent or guardian as a result of a wardship order, the court must specify the maximum time of confinement, which cannot exceed the maximum term of imprisonment to which an adult convicted of the same offense would be subjected. (*In re Edward B.* (2017) 10 Cal.App.5th 1228, 1238.) Welfare and Institutions Code section 726, subdivision (d) provides that if "the court elects to aggregate the period of physical confinement on multiple counts . . . the

23

'maximum term of imprisonment' shall be the aggregate term of imprisonment specified in subdivision (a) of Section 1170.1 of the Penal Code."

Section 1170.1, subdivision (a) provides, in relevant part: "the aggregate term of imprisonment for all these convictions shall be the sum of the principal term, the subordinate term, and any additional term imposed for applicable enhancements for prior convictions, prior prison terms, and Section 12022.1. The principal term shall consist of the greatest term of imprisonment imposed by the court for any of the crimes . . . . The subordinate term for each consecutive offense shall consist of one-third of the middle term of imprisonment prescribed for each other felony conviction for which a consecutive term of imprisonment is imposed . . . ."

Section 654, subdivision (a), provides in pertinent part, "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." "Section 654 prohibits punishment for two crimes arising from a single, indivisible course of conduct. [Citation.] This is 'to ensure that a defendant's punishment will be commensurate with his culpability.'" (*People v. Kopp* (2019) 38 Cal.App.5th 47, 90 (*Kopp*), review granted on another issue Nov. 13, 2019, S257844.)

"Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.) On appeal we defer to express or implicit determinations that are based upon substantial evidence. (Cf. *People v. Osband* (1996) 13 Cal.4th 622, 730-731.)

In calculating a maximum period of confinement that included the robbery and attempted robbery counts, the juvenile court implicitly found that the offenses were accomplished by separate physical acts from the carjacking and attempted carjacking counts. However, the evidence here is insufficient to support such a finding. Rather, the evidence showed that the carjacking and robbery counts in Petition A were accomplished

24

by the same physical act. The minor threatened Hector E. with a gun, demanded the keys to his car, and physically struggled with the victim before gaining possession of the vehicle and driving away. Similarly, the evidence also showed that the attempted carjacking and attempted robbery counts in Petition B were accomplished by the same physical act. There, the minor threatened Ana S. with a knife, physically struggled to gain access to the car, and attempted to drive away with the vehicle, which included her purse inside.

We agree with the parties that the carjacking and robbery counts as well as the attempted robbery and attempted carjacking counts were based on the same physical acts. (*People v. Corpening* (2016) 2 Cal.5th 307, 314-315 [forceful taking of a van was a single physical act "because that act simultaneously accomplished the actus reus requirement for both the robbery and carjacking. It matters not that this act . . . can be broken down into constituent parts."]; see also *People v. Dominguez* (1995) 38 Cal.App.4th 410, 420 [carjacking and robbery accomplished by same act where the defendant placed a purported gun on back of victim's neck and demanded " 'everything he had,' " and the victim handed over jewelry and fled the vehicle].) Thus, for purposes of calculating the maximum time of confinement, the robbery and attempted robbery counts should have been stayed.

Omitting the robbery and attempted robbery counts, the juvenile court should have calculated the maximum term of confinement as follows. Beginning with the sustained carjacking (§ 215, subd. (a)) count, the principal term should have been set at nine years. To this, the juvenile court should have added the following subordinate terms: (1) one year (one-third the middle term of three years) for felony assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)) in Petition A; (2) 10 months (one-third the middle term of two and a half years) for attempted carjacking (§§ 664, 215, subd. (a)) in Petition B; (3) four months (one-third the one-year term) for the personal use of a deadly or dangerous weapon enhancement (§ 12022, subd. (b)) in Petition B; (4) two

25

months (one-third the maximum term of six months) for one count of misdemeanor hit and run (Veh. Code, § 20002, subd. (a)) in Petition B; and (5) two months (one-third the maximum term of six months) for a second count of misdemeanor hit and run (§ 20002, subd. (a)) in Petition B. The foregoing should have resulted in a maximum period of confinement of 11 years and 6 months, not the 14 years and 6 months adopted by the juvenile court. Thus, the juvenile court erred in its calculation of the maximum term of confinement.

### D. *Senate Bill No. 823*

In addition to a reduction based on section 654, the minor also contends that under recently enacted Senate Bill No. 823, which he argues should be applied retroactively to his case, the maximum period of confinement should be reduced to 7 years and 6 months. The Attorney General concedes that retroactive application is appropriate and a reduction is warranted.

On September 30, 2020, the Governor approved Senate Bill No. 823 and its provisions went into effect. Senate Bill No. 823 amended Welfare and Institutions Code, section 731, former subdivision (c). (See Welf. & Instit. Code, former § 731, subd. (c).) The amended section limited the maximum term of confinement of a minor to the Department of Corrections, Division of Juvenile Justice to "the *middle term* of imprisonment that could be imposed upon an adult convicted of the same offense." (Stats. 2020, ch. 337, § 28, eff. Sept. 30, 2020, italics added.) Senate Bill No. 823 became operative on September 30, 2020, and inoperative on July 1, 2021. (See Welfare and Institutions Code, former § 731, subd. (d) ["This section shall become inoperative on July 1, 2021, and, as of January 1, 2022, is repealed."].) Senate Bill No. 823 now applies the same limitation on the maximum confinement period to all juvenile commitments as of July 1, 2021, by amending Welfare and Institutions Code section 730, subdivision (a)(2), to provide: "A court shall not commit a juvenile to *any juvenile facility* for a

26

period that exceeds the middle term of imprisonment that could be imposed upon an adult convicted of the same offense." (Stats. 2020, ch. 337, § 27, italics added.)

Under the *Estrada*[4] rule, "we presume that newly enacted legislation mitigating criminal punishment reflects a determination that the 'former penalty was too severe' and that the ameliorative changes are intended to 'apply to every case to which it constitutionally could apply,' which would include those 'acts committed before its passage[,] provided the judgment convicting the defendant of the act is not final.' (*Estrada*, *supra*, 63 Cal.2d at p. 745.) The *Estrada* rule rests on the presumption that, in the absence of a savings clause providing only prospective relief or other clear intention concerning any retroactive effect, 'a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.' [Citation.] 'The rule in *Estrada* has been applied to statutes governing penalty enhancements, as well as to statutes governing substantive offenses.' [Citations.]" (*People v. Buycks* (2018) 5 Cal.5th 857, 881-882.)

Here, the statutory amendment at issue is an ameliorative change in the law, which reduces the maximum term of confinement for minors. The Legislature did not express any intent to limit retroactive application of Senate Bill No. 823. (Stats. 2020, ch. 337, § 28.) Thus, under *Estrada*, the definition of maximum term of confinement now found in Welfare and Institutions Code section 730, subdivision (a)(2) should be applied to all cases not yet final.

In this case, the middle term for carjacking is five years. (§ 215, subd. (b).) Accordingly, the minor's maximum term of confinement under the amended statute is 7 years and 6 months. We therefore will direct the juvenile court to issue a new disposition order reflecting the reduced term.

---

[4] *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*).

**IV.    DISPOSITION**

The order is modified to reflect a maximum term of confinement of 7 years and 6 months, and the judgment is affirmed as modified.  The juvenile court is directed to prepare an amended disposition order consistent with our modification and forward the amended order to the appropriate authorities.

_____
ELIA, ACTING P.J.

WE CONCUR:




_____
BAMATTRE-MANOUKIAN, J.




_____
WILSON, J.




*People v. J.S.*
H047756